Brown, Judge, dissenting.
I respectfully dissent. To accept the majority's interpretation of "any evidence" is to accept any modicum of speculative fear or unsubstantiated and misplaced blame as reasonable cause to deny an appropriate use of private property.
At the outset, it is important to recall that the conditional use application before the Commission was not for an ethanol pipeline. As the majority notes in passing in a footnote, Epic already had obtained the approval of the Georgia Department of Transportation and the Macon-Bibb County Engineering Department for the ethanol pipeline right of way. Thus, regardless of whether the Commission approved or denied the conditional use application before it, Epic could build the ethanol pipeline along Barnes Ferry Road and the neighborhood. And regardless of whether the Commission approved or denied the application before it, the Norfolk Southern main rail line would continue to run adjacent to the neighborhood, already carrying hazardous substances such as ethanol.
Our Supreme Court has "previously ruled that in Georgia the substantial-evidence standard is effectively the same as the any-evidence standard ... which shall mean that the record does not *577 contain such relevant evidence as a reasonable mind might accept as adequate to support said decision." (Citations and punctuation omitted.) Emory Univ. v. Levitas , 260 Ga. 894, 897 (1), 401 S.E.2d 691 (1991). See also City of Atlanta Govt. v. Smith , 228 Ga. App. 864, 865 (1), 493 S.E.2d 51 (1997) (overruling cases to the extent they recognize a difference between the any evidence and substantial evidence standards and *410 recognizing that the appropriate standard of review to be applied to issues of fact on writ of certiorari is whether the decision is supported by any evidence).
The majority omits important details from the record in order to downplay the fact that the 1980s jet-fuel pipeline leak, an incident wholly unrelated to the application, and the affected residents' discontent with NuStar, an entity wholly unrelated to Epic, were at the core of the opposition to Epic's application. For instance, at the final hearing, one resident voiced that "the big issue" was that "[NuStar] ... left a leaking pipeline that has not been cleaned up ... [NuStar has] contaminated the area, and they have not remediated it." During the hearing regarding Epic's motion for rehearing, one resident testified as follows:
the last time the Commission voted on this, it was unanimous because-not because it was not the right place for it, but because this community has already been super scarred.... I'm angry that [Epic] would even come back to y'all and ask to put it in the same spot. The contamination is there.... We really, really, really need for Epic and NuStar to take responsibility for what's out there now, clean it up and maybe in ten, 15 years when that community is clean, then they can resubmit...."
In denying Epic's application, one member of the Commission stated,
there will be negative impacts such as light and noise from the rail cars and locomotives that could affect adjacent properties. Additionally, there is the aspect of ethanol being a hazardous and flammable liquid that could pose dangers to the adjacent residents in the event of a derailment, spill, or fire. To me, that's the issue, especially for this neighborhood.... [B]ecause of this neighborhood and some of the things that it's been through and some of the things that they're still trying to figure out, I don't feel comfortable approving [the conditional use application].
The Chairman of the Commission echoed this sentiment, stating *578 "I understand this operation between the 1984 spill and what's going on right now. I know they are two separate issues. But fear is common here. And another opportunity for-for any kind of tragedy is-it's very obvious here...."
The majority's attempt to distinguish the instant case from Fulton County v. Bartenfeld , 257 Ga. 766, 770 (3), 363 S.E.2d 555 (1988), by pointing to the "specific issues raised" here is to no avail. For instance, the majority highlights traffic as a specific issue raised by a citizen during the final hearing to support the Commission's decision. However, the planning report specifically noted that the traffic impact to Barnes Ferry Road would be minimal based on the limited development proposed. In reaching this conclusion, the planning staff requested input from the Macon-Bibb County Traffic Engineering Department, which had "no traffic issues with the proposal."[1] As our Supreme Court explained in Bartenfeld , supra, "opposition [based] upon ... generalized fear, not specifically shown to exist under the facts of this case, [is] insufficient" to rise to the level of any evidence. Id. at 770 (3), 363 S.E.2d 555. Following the majority's line of reasoning leads to the conclusion that specific , unsubstantiated fears somehow hold more weight than general , unsubstantiated fears. Regardless of how narrowly the fear or issue is framed, if it still is "not specifically shown to exist under the facts of the case," it does not rise to the level of any evidence. (Emphasis supplied.) Id. (hearing testimony in opposition to development regarding generalized fear that landfills lower property values and create traffic problems insufficient evidence). Compare Jackson County v. Earth Resources, Inc. , 280 Ga. 389, 391, 627 S.E.2d 569 (2006) (land planning staff's conclusion that landfill would be inconsistent with the Comprehensive Land Use Plan, certified real estate appraiser's opinion that the landfill would negatively affect surrounding property values, and testimony of nearby towns' officials *411 regarding the negative impact of truck traffic amounted to more than generalized fears concerning landfills and supported zoning body's denial of special use permit);[2] Fulton County v. Congregation of Anshei Chesed , 275 Ga. 856, 858-859 (2), 572 S.E.2d 530 (2002) (evidence that the introduction of *579 similar "institutional uses" in a neighborhood across the street had led to increased density development, threatening "the stability of the neighborhood," was sufficient to support the zoning body's decision to deny a conditional use permit for a place of worship within a single-family residential neighborhood), disapproved of on other grounds by City of Cumming v. Flowers , 300 Ga. 820, 797 S.E.2d 846 (2017).
The majority offers that "the planning report stated that the re-zoning would cause 'negative impacts' [such] as light and noise from the rail cars and diesel locomotives'" to support its foregone conclusion that the proposed development would negatively impact adjacent properties. However, the planning report states that these were negative impacts that "could affect adjacent properties." (Emphasis supplied.) Furthermore, the planning report, after identifying these potential negative impacts, went on to outline the various remedial measures Epic proposed to counteract the possibility of these impacts, including that the development would include a 100-foot undisturbed tree buffer, providing a vertical screen as well as horizontal separation from the residences on the opposite side of Barnes Ferry Road. The staff also explained that Epic had designed the transfer facility as a loop such that rail cars would not be uncoupled and recoupled to transfer the ethanol, thus limiting the process's noise. During the final hearing, Epic presented testimony from its land planner that the only noise would come from the train cars traveling on the loop and the transfer process, which would only occur around once per month. According to him, the noise generated from the unloading would be less than the noise already generated by the main rail line and two nearby airports. The design project manager testified that the transfer facility would utilize electrical pumps, making the process "relatively quiet" and that the "loop" design, such that train cars would not have to uncouple and recouple, would further reduce noise. He also explained at the hearing that the lighting for the transfer area would be concentrated at the "loop" and "directional," meaning it would be pointed down toward the operational area. The record is devoid of any evidence that despite those measures there would still be "negative impacts" from light or noise. Compare City of Roswell v. Fellowship Christian School, Inc. , 281 Ga. 767-768 (1), 642 S.E.2d 824 (2007) (zoning body was authorized to deny permit for high school stadium when applicant's own evidence showed that the stadium would add to the already existing adverse traffic conditions in the area due to two other stadiums within one mile, and no practical remedial measures could be taken to counteract that negative consequence).
*580 The majority also points to the planning report's note "that ethanol is a 'hazardous and flammable liquid that could pose a danger to the adjacent residents in the event of a derailment, spill, or fire.' "[3] Again, the majority omits that the planning report goes on to consider the proposed remedial measures:
*412 [Epic] must maintain compliance with several federal and state requirements that are designed to mitigate potential dangers associated with the transfer of ethanol liquid.... The applicant has outlined a plan to mitigate negative impacts to the nearby property owners including the possibility of relocating the ethanol transfer station to a different area of the site [with a greater distance from residences].
The record shows that Epic provided the Commission with its work instructions and safety checklist to be completed each time a transfer occurred, a detailed outline of operational procedures, and a summary of the proposed spill containment system for the facility, including the applicable regulations. During the final hearing, the design project manager, an engineer, testified that the facility would have a containment area-regulated by federal, state, and county guidelines-where any drips or spills would be captured. When questioned by the Commission, he also explained that no vapors or fumes would escape during the process because it is a "closed system," meaning the ethanol is "suck[ed]" out of the train car while air is pumped into the car. Again, no specific evidence was offered to rebut this testimony apart from vocalized and unsubstantiated concerns of "human error[ ]."
In sum, the opposition to the conditional use application was based almost wholly upon the prior NuStar jet-fuel pipeline leak which occurred over 30 years ago along with the affected residents' dissatisfaction with the remediation process and the perceived lack of *581 communication about that spill.[4] Because I believe the superior court clearly grappled with an emotionally charged issue and properly concluded that no evidence supported the Commission's decision under the appropriate standard of review, I respectfully dissent.

The issue of traffic was raised in a petition opposing the proposed development submitted to the Commission. The majority neglects to point out that the record also contains a second written petition signed by local residents supporting the proposed development. Simply put, these rival petitions show public opposition to and support of the proposed development, both grounded on generalized points of view rather than facts supported by evidence.

By contrast, here, the planning staff report concluded that the proposed development would not have an adverse effect on the comprehensive land development plan and that there was "no evidence provided that [the proposed] development [would] adversely affect[ ] property values in adjacent areas."

In its initial report on Epic's re-zoning application, the planning report recommended granting Epic's request to re-zone. However, the planning staff later issued an amended report based on information regarding ethanol that had since come to light. According to the report, the Pipeline and Hazardous Materials Safety Administration (PHMSA) added ethanol to its definition of "hazardous liquids" in March of 2015, meaning PHMSA had determined that ethanol was a substance which "may pose an unreasonable risk to life or property when transported by a hazardous liquid pipeline facility in a liquid state" pursuant to 49 U.S.C. § 60101 (a) (4) (B). (Emphasis supplied.) PHMSA's decision was based on the projected increase in biofuels demand; the belief that pipeline transportation was a more efficient mode of transportation with a consistently lower accident rate than other modes of transportation; and the need for uniform oversight and consistent regulation of energy liquids by PHMSA. Despite this new information, the planning staff did not recommend denying the request to re-zone.

NuStar held a meeting with some of the affected residents in May of 2015 to explain the remediation efforts and the progress that had been made. An official from the Georgia Department of Public Health sent a memorandum dated June 2, 2015, to the Macon-Bibb County Environmental Health Manager after "a resident of Barnes Ferry Road raised concerns of the proposed Epic ... Ethanol transfer rail spur rezoning...." The memorandum clarified that "[t]he past [jet-fuel] incident and its cleanup is [a] separate issue from the proposed rail spur," and included a summary of the jet-fuel pipeline leak and the remediation efforts. The memorandum explained that Epic had submitted a required safety plan to the PHMSA which covered safety protocol for staff training, equipment, and procedures on how to respond to emergency situations. Additionally, the memorandum set forth general information about ethanol, including that ethanol rapidly biodegrades in soil and water; any released ethanol vapor disperses rapidly; and "[f]rom a toxicity and environmental standpoint, denatured fuel grade Ethanol is a safer alternative to the 50/50 mix of gasoline and kerosene that comprised [the jet-fuel pipeline leak]." The land planner's report echoes this, citing a portion of a class given to firefighters on ethanol as follows: "Ethanol is less toxic than gasoline or methanol. Carcinogenic compounds are not present in pure ethanol."